IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

EVANSTON INSURANCE COMPANY,    *
    *
    Plaintiff,    *
    *
    v.    *    CV 117-140
    *
XYTEX TISSUE SERVICES, LLC;    *
XYTEX CRYO INTERNATIONAL,    *
LTD.; XYTEX PROPERTIES LLC;    *
LINDSEY MEAGHER, Individually,    *
and as Executor for the Estate    *
of Greg Meagher; MARY M.    *
MEAGHER; and EMMA G. MEAGHER,    *
    *
    Defendants.    *

O R D E R

Before the Court are the following motions: (1) Plaintiff and
Defendants Xytex Issue Services, LLC, Lindsey Meagher, Mary M.
Meagher, and Emma G. Meacher's ("Existing Parties") joint motion
to add defendants (Doc. 48); (2) Plaintiff's motion to exclude
expert testimony (Doc. 24); and (3) Plaintiff's motion for summary
judgment (Doc. 25). The joint motion to add defendants is **GRANTED**.
Plaintiffs' motion to exclude expert testimony is **GRANTED IN PART**
and **DENIED IN PART**. Finally, Plaintiff's motion for summary
judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

### A. Underlying State Court Action

The facts alleged in the underlying state court tort action, Meagher v. Xytex Tissue Services, LLC, No. 2017RCCV00492, Superior Court of Richmond County, Georgia ("Underlying Lawsuit"), giving rise to the present coverage action are largely undisputed. (See Underlying Lawsuit Compl., Doc. 1-2.) Defendant Xytex Tissue Services, LLC ("Defendant Xytex") stores biological material at low temperatures. (St. of Mat. Facts, Doc. 25-2, ¶ 1 (admitted).)[1] To keep the material cooled to the appropriate temperature, Defendant Xytex employs cryogenic storage freezers "cooled by an on-site liquid nitrogen delivery system." (Id. ¶ 3 (admitted).) If the pressure in the delivery system exceeds the permissible limits, the relief valves open to release liquid nitrogen and lower the pressure in the system. (Id. ¶¶ 6, 10 (admitted).) Once released, the liquid nitrogen vaporizes into nitrogen gas. (See id. ¶¶ 6, 14 (admitted).) On February 5, 2017, the pressure release process occurred. (Id. ¶¶ 8, 10 (admitted).) The system

---

[1] Here, Defendant Xytex specifically admits Plaintiff's Statement of Undisputed Material Fact. (Resp. to St. of Mat. Facts, Doc. 32-1, ¶ 1.) However, in admissions elsewhere, Defendant Xytex responds to Plaintiff's Statement of Undisputed Material Facts with the response: "Xytex admits the complaint in the underlying tort action makes the allegations contained in [the] statement." (See, e.g., id. ¶ 3.) Because "[a]n insurer's duty to defend turns on the language of the insurance contract and the allegations of the complaint asserted against the insured," Ga. Farm Bureau Mut. Ins. Co. v. Vanhuss, 532 S.E.2d 135, 136 (Ga. Ct. App. 2000), an admission that the complaint in the Underlying Lawsuit makes the allegation is sufficient to establish an undisputed fact for the purposes of this summary judgment motion. Accordingly, the Court designates Defendant's responses in this form as "admitted" unless otherwise noted.

released the liquid nitrogen — which subsequently vaporized — into Defendant Xytex's warehouse. (Id. ¶ 7 (admitted).)

The discharge of the nitrogen into the warehouse set in motion a series of unfortunate events. At the outset, the oxygen level in the warehouse began to drop, triggering the warehouse's oxygen sensor alarm. (Id. ¶ 11 (admitted).) The accumulation of gaseous nitrogen in the warehouse formed a dense fog setting off the warehouse's motion detectors and burglar alarms. (Id. ¶¶ 14, 15 (admitted).) A Defendant Xytex employee first responded to the alarms, then collapsed in the warehouse. (Id. ¶¶ 21-22; Underlying Lawsuit Compl., ¶ 30.) Next, Deputy Greg Meagher entered the warehouse. (St. of Mat. Facts, ¶ 23 (admitted).) He, too, succumbed to the conditions in the warehouse and died as a result. (Id. ¶ 24; Underlying Lawsuit Compl., ¶ 33.)

Following Deputy Meagher's passing, Lindsey Meagher, Mary Margaret Meagher, and Grace Meagher ("Meagher Defendants") filed the Underlying Lawsuit against Defendant Xytex and other defendants. (Underlying Lawsuit Compl.) Plaintiff, disputing its duties to indemnify and defend, is defending Defendant Xytex in the Underlying Lawsuit under a reservation of rights. (Reservation of Rights Letters, Docs. 22-1, 22-3, 22-4, 22-6.)

## B. The Declaratory Judgment Action

Believing coverage is excluded under two insurance policies, Plaintiff filed the instant declaratory judgment suit. (See

3

Compl., Doc. 1.) Defendant Xytex is an additional named insured under commercial general liability policy number 3AA116895 ("Primary Policy") and named insured on commercial excess policy number EZXS1005877 ("Excess Policy," and collectively with Primary Policy, "Policies"). (St. of Mat. Facts, ¶¶ 33, 34 (factual assertions admitted).) Plaintiff asks that the Court grant summary judgment, thereby declaring that it has no duty to defend or indemnify Defendant Xytex in connection with the Underlying Lawsuit. (Mot. for Summ. J., Doc. 25, at 1.)

1. Insurance Policies

The General Policy contains the following coverage:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" . . . to which this insurance applies.[2] We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" . . . to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

> (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

---

[2] The provision also contains coverage for "property damage." Property damage is not at issue because the complaint in the Underlying Lawsuit omits allegations of damages attributable to property damage. (See Underlying Lawsuit Compl.)

4

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

(Primary Policy, Doc. 1-3, at 30.)

The Parties[3] agree that the Primary Policy is modified by a Total Pollution Exclusion Endorsement that provides, in relevant part: "This insurance does not apply to: . . . (1) 'Bodily injury' . . . which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (Id. at 56.) As defined by the Primary Policy, "pollutants" are "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Id. at 44.)

The Punitive or Exemplary Damages Exclusion in the Combination General Endorsement further modifies the Primary Policy: "This insurance does not apply to: . . . Fines, penalties, and punitive or exemplary damages, or any expenses or any obligation to share such damages or repay another." (Id. at 59.)

___

[3] Unless otherwise stated, "Parties" refers to all parties to this action inclusive of the parties added pursuant to this Order. The additional parties are deemed to have been parties to this lawsuit from its inception. Moreover, all filings to this point are deemed, as stated herein, to also have been filed on behalf of the defendants added pursuant to this Order. (See Section V, infra.)

The Combination General Endorsement also contains a Hazardous or Toxic Materials exclusion: "This insurance does not apply to: . . . 'Bodily injury' . . . or any injury, loss, or damage, including consequential injury, loss or damage, arising out of, caused or contributed to by 'hazardous or toxic materials' . . . ." (Id. at 59-60.) "Hazardous or toxic materials" is defined as "asbestos, lead, silica dust, toxic dust, 'fungi', bacteria, organic pathogens, bio-organic growth or systemic chemical poison." (Id. at 61.)

The Excess Policy insured Defendant Xytex beyond the limits of the Primary Policy. (St. of Mat. Facts, ¶¶ 40-41 (factual assertions admitted).) As with the Primary Policy, the Excess Policy contains a Pollution exclusion: "This policy does not apply to . . . [a]ny liability arising out of actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (Excess Policy, Doc. 1-4, at 37.) "Pollutants," in relevant part, is defined the same in the Excess Policy as the Primary Policy. (Compare id., with Primary Policy, at 44.) The Excess Policy additionally contains a Punitive or Exemplary Damages exclusion. (Excess Policy, at 38.)

2. Reservation of Rights

Plaintiff drafted and sent Defendant Xytex several "Reservation of Rights" letters. The first letter, dated February 13, 2017, explained that Plaintiff was investigating the incident

and reserved the right to supplement the letter in the future. (Doc. 22-1.) At the time of the second Reservation of Rights letter, dated June 12, 2017, no lawsuit had been filed, and Plaintiff notified Defendant Xytex that it was continuing to investigate the matter. (Doc. 22-3.) The third Reservation of Rights letter confirmed Defendant Xytex's receipt of notice of the Underlying Lawsuit. (Doc. 22-4.) In relevant part, the third letter "reserve[d] the right to seek reimbursement of any defense costs paid on Xytex's behalf if a court finds that [Plaintiff] has no duty to defend Xytex for all of the claims in the Lawsuit." (Id. at 12.) Plaintiff sent a final letter (Doc. 22-6) in response to a letter from Defendant Xytex's counsel. Plaintiff again expressed it would "continue to defend Xytex for the Lawsuit, but that defense will be subject to the full reservation of rights set out in the" third Reservation of Rights letter. (Id.)

3. Testimony of Dr. Eric J. Zuckerman

Defendant Xytex offers the testimony of Dr. Eric J. Zuckerman as an expert in chemistry. (Resp. to Mot. to Exclude Test., Doc. 31, at 2, 7.) Dr. Zuckerman is an Associate Professor in the Department of Chemistry and Physics at Augusta University. (Zuckerman Curriculum Vitae, Doc. 16-1, at 1.) Dr. Zuckerman holds bachelor's, master's, and doctorate degrees in chemistry. (Id.) Defendant Xytex tenders Dr. Zuckerman's testimony to support its position that liquid nitrogen is not an irritant, contaminant, or

systemic chemical poison. (Zuckerman Expert Report, Doc. 16; Resp. to Mot. to Exclude Test., at 7.)

Plaintiff asks the Court to exclude Dr. Zuckerman's testimony entirely or, in the alternative, exclude portions of his testimony interpreting the insurance contract. (Br. Supp. Mot. to Exclude Test., Doc. 24-1, at 11-21.) Plaintiff argues that Dr. Zuckerman's testimony is improper because interpreting the contract is a matter of law for the Court and he is unqualified to testify as an expert regarding matters of insurance. (Id.)

### 4. Joint Motion to Add Defendants

After completing summary judgment briefing, the Parties filed their joint motion to add Lindsey Meagher, as Executor for the Estate of Greg Meagher[4]; Xytex Cryo International, LTD.; and Xytex Properties LLC as party defendants in this action pursuant to Federal Rules of Civil Procedure 19 and 21 ("Joinder Defendants," and collectively with Defendant Xytex and Meagher Defendants, "Defendants"). (Joint Mot. to Add Defs., Doc. 48.) The Parties represent that the Underlying Lawsuit was recently amended to add Lindsey Meagher, as Executor for the Estate of Greg Meagher, as a plaintiff and the remaining Joinder Defendants as defendants. (Id. ¶ 2.) The joint motion further: (1) Requests that the Joinder Defendants be treated as if they were parties from the commencement

---

[4] Lindsey Meagher is already a party to this suit in her individual capacity. (See Compl., at 1.)

of this action; and (2) States that the Joinder Defendants agree to be bound by the rulings on Plaintiff's motions for summary judgment and to exclude expert testimony. (Id. ¶¶ 9, 13.)

## II. JOINT MOTION TO ADD DEFENDANTS

The Parties agree that with the addition of the Joinder Defendants to the Underlying Lawsuit, they are necessary defendants in this action. (Joint Mot. to Add Defs., ¶¶ 1-2, 4-5.) The Court agrees that adding the Joinder Defendants is proper.

## III. MOTION TO EXCLUDE EXPERT TESTIMONY

Plaintiff objects to the admission of Dr. Zuckerman's testimony pursuant to Federal Rule of Evidence 702 and Daubert. Defendant Xytex responds that Dr. Zuckerman meets all necessary requirements as a chemistry expert. The Court initially addresses the standard employed to analyze such disputes.

### A. Daubert Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

"As the Supreme Court recognized in <u>Daubert v. Merrell Dow Pharms., Inc.</u>, [509 U.S. 579 (1993)], Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of [expert] testimony." <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1340 (11th Cir. 2003). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility of expert testimony under Rule 702. <u>Quiet Tech.</u>, 326 F.3d at 1340. Specifically, the court must consider whether:

(1) [t]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Id.</u> at 1340-41.

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. <u>Trilink Saw</u>

Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008). "A witness's qualifications must correspond to the subject matter of his proffered testimony." Anderson v. Columbia Cty., No. CV 112-031, 2014 WL 8103792, at *7 (S.D. Ga. Mar. 31, 2014) (citing Jones v. Lincoln Elec. Co., 188 F.3d 709, 723 (7th Cir. 1999)). However, an expert's training need not be narrowly tailored to match the exact point of dispute. McDowell v. Brown, 392 F.3d 1283, 1297 (11th Cir. 2004).

Second, the testifying expert's opinions must be reliable. In Daubert, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. There are four factors that courts should consider: (1) whether the theory or technique can be tested, (2) whether it has been subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained general acceptance in the relevant community. Id. at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004). For example,

experience-based experts need not satisfy the factors set forth in Daubert. See United States v. Valdes, 681 F. App'x 874, 881 (11th Cir. 2017) (affirming admission of testimony from expert identifying firearms based upon years of experience working with firearms). However, "[t]he inquiry is no less exacting where the expert 'witness is relying solely on experience' rather than scientific methodology." Summit at Paces, LLC v. RBC Bank, No. 1:09-cv-03504-SCJ, 2012 WL 13076793, at *2 (N.D. Ga. May 22, 2012) (quoting FED. R. EVID. 702, advisory committee's notes to 2000 amendment)). Bearing in mind the diversity of expert testimony, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." FED. R. EVID. 702, advisory committee's notes to 2000 amendment. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden.

Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, "if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation omitted).

Third, expert testimony must assist the trier of fact to decide a fact at issue. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591. To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Daubert, 509 U.S. at 591; Frazier, 387 F.3d at 1262. Yet, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63. At times, expert testimony is required in contract interpretation to "clarify or define terms of art, science, or trade." See TCP Indus., Inc. v. Uniroyal, Inc., 661 F.2d 542, 549 (6th Cir. 1981).

**B. Discussion**

Plaintiff asserts that Dr. Zuckerman's testimony will not assist the trier of fact, that Dr. Zuckerman is not qualified to

testify as an insurance expert, and that Dr. Zuckerman's methodology is unreliable. The Court addresses each contention.

## 1. Fit

Plaintiff's primary objection to the admission of Dr. Zuckerman's testimony is that his testimony does not "fit" the issue the trier of fact will decide. The Court understands Plaintiff's "fit" argument to be multifaceted. First, Plaintiff argues that Dr. Zuckerman's testimony does not assist with interpreting the Pollution and Hazardous or Toxic Materials exclusions. Second, Plaintiff contends Dr. Zuckerman offers impermissible legal conclusions. The Court addresses Plaintiff's positions in turn.

The Court agrees with Plaintiff's argument that, as discussed in Section IV(B), *infra*, determining the plain language of the contract and applying rules of construction when necessary is a matter of law for the Court. But Plaintiff does not address whether Dr. Zuckerman's testimony fits in the event the Court determines the Policies' language is ambiguous and the rules of contract construction do not resolve the ambiguity as a matter of law.[5] At that point, the contracting parties' intended meaning of the terms contained in the Policies becomes a fact issue for the

---

[5] Based on the well-established principle that contract construction is a question of law, the Court refrains from consulting the opinions of Dr. Zuckerman in determining whether the terms are ambiguous in Section IV(B), *infra*.

jury. <u>RLI Ins. Co. v. Highlands on Ponce, LLC</u>, 635 S.E.2d 168, 171 (Ga. Ct. App. 2006); <u>see also</u> O.C.G.A. § 13-2-1 ("The construction of a contract is a question of law for the court. Where any matter of fact is involved, the jury should find that fact."); O.C.G.A. § 13-2-2.

Plaintiff takes the position that if the Court refuses to conclude that the policy unambiguously excludes coverage Plaintiff is obligated to provide a defense under Georgia law. At that point, the issue is resolved, and Dr. Zuckerman's testimony will be useless to a jury. Again, the Court agrees with Plaintiff's interpretation of Georgia law on this point. <u>See BBL-McCarthy, LLC v. Baldwin Paving Co.</u>, 646 S.E.2d 682, 685 (Ga. Ct. App. 2007). Of course, Plaintiff's complaint contends that it has no duty to defend or indemnify under the Policies. (Compl., ¶¶ 41-42, 44-45.) Plaintiff also moves for summary judgment on both issues: the duties to defend and indemnify. In the event the Court concludes that the allegations in the complaint of the Underlying Lawsuit do not unambiguously exclude coverage, Plaintiff will have a duty to defend. But, if ambiguity remains regarding Plaintiff's obligation to indemnify, a jury will resolve the intent of the Parties. Said another way, upon a finding of ambiguity, Plaintiff's duty to defend will be decided, but a jury in this declaratory judgment action will analyze fact issues ultimately determining if Plaintiff has a duty to indemnify. Consequently,

if Dr. Zuckerman's testimony meets the other <u>Daubert</u> requirements, his testimony is admissible to assist the jury in resolving the remaining fact issues.

Second, Plaintiff offers authority stating that the expert may not simply reiterate Defendant Xytex's contract interpretation or the legal arguments of its counsel. (Br. Supp. Mot. to Exclude Test., at 12.) Pursuant to Federal Rule of Evidence 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue." "However, an expert may not 'merely tell the jury what result to reach.'" <u>N. Am. Specialty Ins. Co. v. Wells</u>, No. CV 412-146, 2013 WL 4482455, at *2 (S.D. Ga. Aug. 19, 2013) (quoting <u>Montgomery v. Aetna Cas. & Sur. Co.</u>, 898 F.2d 1537, 1541 (11th Cir. 1990)). The Court agrees that "[e]xpert testimony may only tread delicately on underlying legal principles in the context of insurance claim disputes." <u>Magnolia Bankshares, Inc. v. Fed. Ins. Co.</u>, No. CV 312-055, 2014 WL 12703719, at *4 (S.D. Ga. Apr. 28, 2014).

To the extent Defendant Xytex proffers Dr. Zuckerman to inform the jury that liquid nitrogen is outside the general Pollution or Hazardous or Toxic Materials exclusion or comments on Plaintiff's duty to defend or indemnify, his testimony is excluded. (<u>See,</u> <u>e.g.,</u> Zuckerman Expert Report, Doc. 16, ¶ 7 ("Liquid nitrogen is not a 'pollutant' as defined in section (ii) below because it is neither an irritant nor a contaminant under the facts of this

case."), ¶ 14 ("In addition, liquid nitrogen is not a 'hazardous or toxic material' as defined in section (ii) below.")  However, to the extent fact issues remain as to the intent and understanding of ambiguous terms — i.e., irritant, contaminant, or systemic chemical poison — Dr. Zuckerman is permitted to testify regarding the nature of liquid nitrogen, its classification as one of the ambiguous terms in the science community, and any other opinions he is qualified to offer that are not merely a legal conclusion or legal opinion.  Ultimately, the contracting parties' intended meaning of ambiguous terms is a question of fact.  Dr. Zuckerman's opinions regarding these ambiguous terms are not excluded simply because his opinions may embrace an ultimate issue for the jury. See Cook ex rel. Estate of Tessier, 402 F.3d at 1112 n.8.

  2. Qualified to Testify

  Plaintiff next disputes Dr. Zuckerman's competency to testify under the "qualified" prong of Daubert, and the cases in the Eleventh Circuit interpreting it, claiming that he is unqualified to testify as an insurance expert.  First, the Court agrees that Dr. Zuckerman is not qualified to testify as an insurance expert, and Defendant Xytex concedes that it is not offering Dr. Zuckerman for his insurance expertise.  (Resp. to Mot. to Exclude, at 7.) Authority does not require an expert to be qualified as to all issues that may arise in a particular case.  Before his testimony may be admitted, the expert must be "qualified to testify

competently regarding the matters *he intends to address*." <u>City of</u>
<u>Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir.
1998) (emphasis added). Insurance is undoubtedly a large element
of this dispute, but Dr. Zuckerman is not proffered to opine on
the interpretation of these terms generally in the insurance
industry. Dr. Zuckerman intends to offer testimony as to
terminology in the field of chemistry and the nature of liquid
nitrogen, both subject matters within his expertise. Defendant
Xytex's business is science oriented. Should the contracting
parties' intent become an issue of fact, Defendant Xytex's
understanding of certain terms could become relevant to resolving
that fact issue. (<u>See</u> Scholer Decl., Doc. 32-3, at ¶¶ 2, 4, 5,
6.) Plaintiff does not dispute whether Dr. Zuckerman is qualified
as a chemistry expert, and the Court sees no issue with his
qualifications as such.

    With that said, the Court reaches the following conclusions.
Although the Court finds little, if anything, in the record that
needs to be excluded as outside the scope of Dr. Zuckerman's
expertise,[6] the Court agrees with Plaintiff that Dr. Zuckerman is
not permitted to testify as an expert on insurance matters. To

---

[6] Dr. Zuckerman testified that he has almost zero experience reading and
interpreting insurance policies, and he has never researched how courts
interpret insurance policies. (Zuckerman Dep., Doc. 23-1, at 18-19.) Dr.
Zuckerman further testified that he is not an insurance expert, he is offering
his opinions based on his scientific qualifications, and he is qualified to
give his opinion — "[c]hemically speaking" — on the definitions of certain terms
at issue. (<u>Id.</u> at 63-64.)

the extent he intends to testify regarding matters requiring insurance industry experience, that testimony is excluded. This exclusion, however, does not apply to Dr. Zuckerman offering his opinion on the meaning or intent of ambiguous, technical words in the relevant exclusions from the perspective of a chemistry expert. See O.C.G.A. § 13-2-2(2).

### 3. Methodology

Finally, Plaintiff moves to exclude Dr. Zuckerman's testimony because his methodology is unreliable. The record shows that Dr. Zuckerman applied his knowledge in the field of chemistry to certain terms at issue in this case. Dr. Zuckerman has studied the nature of liquid nitrogen over the course of his career. Through that time, he gained a sufficient familiarity and expertise with liquid nitrogen to reliably classify liquid nitrogen under certain scientific terminology.

Plaintiff first takes issue with the fact that Dr. Zuckerman did not conduct on-site testing or recreate an oxygen-deprived environment before arriving at his conclusions. The Court finds this argument unavailing. The Eleventh Circuit has recognized the existence of experience-based methodology. See Frazier, 387 F.3d at 1262. Furthermore, the trial court is given considerable discretion to determine reliability depending on the facts of the case. Kuhmo Tire, 526 U.S. at 152. "To be sure, there are instances in which a district court may determine the reliability

prong under Daubert based primarily upon an expert's experience and general knowledge in the field . . . ." Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1336 (11th Cir. 2010).

In the context of this case, field testing was unnecessary. Dr. Zuckerman's scientific opinion is that vaporized liquid nitrogen is never an irritant, contaminant, or poison under the facts presented based upon the meaning of those terms.[7] Had he performed any number of tests, his opinions would be the same because they are based on his experience evaluating the nature of nitrogen and vaporized liquid nitrogen's interaction with the human body and natural air. To the extent Plaintiff disputes the factual accuracy of this opinion, it will have the opportunity to challenge it on cross examination.

Furthermore, although applying "common knowledge" to "fundamental definitions" in the scientific world does not easily lend itself to peer review or an error rate, Dr. Zuckerman consulted additional sources to confirm his understanding of the issue. (Zuckerman Dep., Doc. 23-1, at 8-11, 41.) There is little left for Dr. Zuckerman to do when relying on his own expertise and experience with nitrogen and scientific terminology. For this reason, district courts are given flexibility to determine which, if any, of the Daubert reliability factors apply in a particular

---

[7] The Court recognizes that Dr. Zuckerman testified that liquid nitrogen could be a thermal irritant based on its inherent temperature. (Zuckerman Dep., at 54-55.) However, thermal irritation is not at issue in this case.

case. Quiet Tech., 326 F.3d at 1341 (Courts consider Daubert reliability factors "to the extent possible.")

Under these circumstances, Plaintiff's reliance on the reliability factors set forth in Daubert is misplaced. Although Dr. Zuckerman's opinions are scientific, his opinions do not rely on experimental testing or scientific methodology. As stated in Valdes, when the methodology involves "mere identification and comparison" utilizing the expert's years of experience on that particular subject, the factors outlined in Daubert are generally inapplicable. 681 F. App'x at 881. Here, Dr. Zuckerman is asked to provide the meaning of certain terms in his field and compare those terms with his knowledge of liquid nitrogen. Dr. Zuckerman's testimony explains how his experience leads to his conclusions, why that experience is a sufficient basis for the opinions, and how the experience is reliably applied to the facts. (Zuckerman Dep., at 15, 29–30, 36–44.) His years of studying and teaching chemistry provided him the expertise needed to provide his opinion in this case.

Here, Dr. Zuckerman's significant experience as a chemistry scholar and professor and his involvement with liquid nitrogen satisfy the Court that his opinions are reliable in the scientific community. Because the Court concludes (1) Dr. Zuckerman is qualified to testify as a chemistry expert; (2) his methodology for his opinions as to the meaning of terms in the scientific

community is sufficiently reliable; and (3) his testimony will assist the trier of fact, except as otherwise limited herein, Dr. Zuckerman's testimony is admissible.

## IV. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could "affect the outcome of the suit under the governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001). The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because the standard for summary judgment mirrors that of a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial. Id. "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it 'must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.'" Four Parcels of Real Prop., 941 F.2d at 1438 (emphasis omitted) (quoting Celotex Corp., 477 U.S. at 331 (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" Id. (quoting Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1477 (11th Cir. 1991)).

In this action, the Clerk of Court gave Defendants notice of the motion for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 26.) For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The

time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration.

**B. Discussion**

The Parties disagree whether the release of nitrogen implicates exclusions under the Primary and Excess Policies. Accordingly, the questions before the Court are ones of contract interpretation. First, as this is a diversity jurisdiction case, the Court is bound by the applicable state law governing the contract. Giddens v. Equitable Life Assurance Soc'y of the U.S., 445 F.3d 1286, 1297 n.9 (11th Cir. 2006). The Parties do not dispute that Georgia law controls.

Initially, under Georgia law, the construction of a contract "is a question of law for the court." Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co., 707 S.E.2d 369, 371 (Ga. 2011). Insurance "is a matter of contract and the parties to the contract of insurance are bound by its plain and unambiguous terms." Hurst v. Grange Mut. Cas. Co., 470 S.E.2d 659, 663 (Ga. 1996). "Words used in the policy are given their usual and common meaning, and the policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." Liberty Surplus Ins. Corp. v. Norfolk S. Ry. Co., 684 F. App'x 788, 790 (11th Cir. 2017) (quoting Ga. Farm Bureau Mut. Ins. Co. v. Smith, 784 S.E.2d 422, 424 (Ga. 2016)). An insurance company is permitted

to "fix the terms of its policies as it sees fit, so long as they are not contrary to the law," and is free "to insure against certain risks while excluding others." Smith, 784 S.E.2d at 424.

Consistent with the general rule governing contract interpretation, construction of an insurance contract is a question of law. Elan Pharm. Research Corp. v. Emp'rs Ins. of Wausau, 144 F.3d 1372, 1375 (11th Cir. 1998) (applying Georgia law). Under Georgia law, an insurer's refusal to defend is justified only if the complaint "does not assert any claims upon which there would be insurance coverage." City of Atlanta v. St. Paul Fire & Marine Ins. Co., 498 S.E.2d 782, 784 (Ga. Ct. App. 1998). As with the general interpretation of insurance contracts, Claussen v. Aetna Cas. & Surety Co., 380 S.E.2d 686, 687-88 (Ga. 1989), any doubt as to an insurer's duty to defend, "should be resolved in favor of the insured." Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc., 490 S.E.2d 374, 376 (Ga. 1997). To succeed on summary judgment that it has no duty to defend, Plaintiff must show the terms of the policy "unambiguously exclude coverage." BBL-McCarthy, 646 S.E.2d at 685.

Under Georgia's contract construction methodology, the first question is whether the terms contained in the Policies' exclusions are unambiguous. "Where the contractual language is explicit and unambiguous, 'the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the

carrier or the insured.'" *Jones v. Golden Rule Ins. Co.*, 748 F. App'x 861, 864 (11th Cir. 2018) (quoting *Smith*, 784 S.E.2d at 424). In determining whether the relevant terms are unambiguous, the Court looks to the text of the Policies. *Smith*, 784 S.E.2d at 424.

1. Pollution Exclusion

Plaintiff argues that the released nitrogen meets the definitions of "pollutant" in the Primary Policy and the Excess Policy. Strictly from the definitions in the Policies, the Court is unable to conclude that "pollutant" unambiguously governs the factual scenario in this case. "Pollutant" is not defined to expressly include nitrogen.[8] The pollutant definition, however, does encompass an "irritant" or "contaminant," but "irritant" and "contaminant" are not defined in the Policies. Accordingly, the Court must determine whether "irritant" or "contaminant" unambiguously include nitrogen pursuant to the Policies' plain language.

Defendant Xytex contends that *Barrett v. Nat'l Union Fire Ins. Co.*, controls. 696 S.E.2d 326 (Ga. Ct. App. 2010). In *Barrett*, the insurance policy at issue defined "pollutant" the

---

[8] Plaintiff cites definitions for "pollutant" not contained in the Policy. As stated below, under Georgia law, the Court may not substitute outside definitions for the plain language in the Policy. *Sorema N. Am. Reinsurance Co. v. Johnson*, 574 S.E.2d 377, 379 (Ga. Ct. App. 2002) (A court is "not authorized to substitute . . . any other definition of the term . . . for the one in the insurance policy when the policy plainly and unambiguously define[s] the term.").

same as the Policies. Id. at 329. Barrett involved accumulation of natural gas creating an "oxygen-deprived" environment, and "the lack of oxygen" injured the plaintiff. Id. at 330. Barrett distinguished itself from Reed v. Auto-Owners Ins. Co., 667 S.E.2d 90 (Ga. 2008), which concluded that "irritant" and "contaminant" unambiguously included carbon monoxide in a home. Barrett, 696 S.E.2d at 330.

In response, Plaintiff contends this Court is bound by decisions of the Georgia Supreme Court and the Eleventh Circuit Court of Appeals. Plaintiff relies on Smith, 784 S.E.2d 422, which relied on the reasoning set forth in Reed. Smith involved the same definition of "pollutant" as the Policies here, in Barrett, and in Reed. Id. at 425. The Smith Court concluded that lead-based paint was a "pollutant" under the relevant exclusion. Id. at 426.

Plaintiff also directs attention to the unpublished Eleventh Circuit decision, Owners Ins. Co. v. Lake Hills Home Owners Ass'n, No. 02-14556, 57 F. App'x 415 (Table) (11th Cir. 2002) (per curiam). (Doc. 25-6.) Examining the same definition for "pollutant," the Eleventh Circuit found that "silt, sediment, and storm water run-off caused property damage, had 'significant detrimental effects on the quality of waters into which they flow,' and 'may present an imminent and substantial endangerment to health

or the environment,'" triggering the Pollution exclusion. (Id. at 6.)

Plaintiff argues that to the extent there is contention in authority between the Court of Appeals of Georgia, the Supreme Court of Georgia, and the Eleventh Circuit, the Court is required to follow the Georgia Supreme Court and the Eleventh Circuit. (Pl.'s Reply to Def.'s Resp. to Mot. for Summ. J., Doc. 37, at 3.) Plaintiff's conclusion is correct. See Great Am. All. Ins. Co. v. Anderson, 847 F.3d 1327, 1333 (11th Cir. 2017) ("When interpreting matters of state law, [the Eleventh Circuit] must follow the decision of the state's highest court.") (internal quotation marks omitted); EmbroidMe.com, Inc. v. Travelers Prop. Cas. Co. of Am., 845 F.3d 1099, 1105 (11th Cir. 2017) ("When [the Eleventh Circuit] address[es] issues of state law, we are . . . bound by decisions issued by that state's appellate courts. However, when we have issued a precedential decision interpreting that state law" the Eleventh Circuit is bound to follow that precedent "absent a later decision by the state appellate court casting doubt on our interpretation of that law."). Plaintiff's premise of contention between the decisions, however, is incorrect. The Court fails to see how Barrett, Reed, Smith, and Lake Hills are "irreconcilable." See Anderson, 847 F.3d at 1333.

In Barrett, the underlying complaint alleged that the accumulation of natural gas created an oxygen-deprived environment

causing the brain injury at issue; the complaint did not allege that the actual inhalation of natural gas caused the injury. Conversely, Reed and Smith addressed carbon monoxide poisoning and lead poisoning, respectively, both harmful substances known to cause injury. As such, those cases can be distinguished from Barrett in that the release of lead or carbon monoxide is undoubtedly an irritant or contaminant. Lake Hills is also distinguishable from Barrett.[9] Lake Hills involved property damage as opposed to bodily injury. Lake Hills, at 2-3. Thus, although water runoff may ordinarily be benign as Plaintiff argues, it is undoubtedly a contaminant or irritant when it negatively impacts the purity of a body of water. Id. at 6-7. The same water runoff is not necessarily an "irritant" or "contaminant" capable of causing bodily injury, though. Because Reed, Smith, and Lake Hills contained facts sufficiently different from those presented here, the Court cannot conclude from those cases that "irritant" or "contaminant" necessarily includes nitrogen.

Furthermore, dictionary definitions of irritant and contaminant do not solve the discrepancy. When an insurance term is undefined, courts may "use the dictionary to determine the plain

---

[9] The Court recognizes that Lake Hills is not binding precedent. Although the Court will not ignore persuasive authority that is directly on-point, for the reasons contained herein, the difference between an irritant or contaminant in a property injury claim versus a bodily injury claim distinguishes Lake Hills from the present case.

and generally accepted meaning of the term."[10]  <u>Empire Fire & Marine</u>

<u>Ins. Co. v. Daniels</u>, 631 S.E.2d 799, 802 (Ga. Ct. App. 2006).

The Parties supplied the Court a generous stock of definitions to consider. Upon reviewing several definitions, the Court concludes that Plaintiff's definitions, applied in <u>Lake Hills</u>, do not render nitrogen's status as an "irritant" or "contaminant" unambiguous.[11]  <u>Lake Hills</u>, citing the Random House Unabridged Dictionary (2d ed. 1987), defined "irritant" as "anything that annoys" and "contaminant" as "something that makes 'impure or unsuitable by contact or mixture with something unclean, bad,

---

[10] <u>Reed</u> determined that analyzing outside definitions was unnecessary when carbon monoxide was the substance at issue:

> We need not consult a plethora of dictionaries and statutes to conclude that [carbon monoxide] is [an irritant or contaminant]. After all, the very basis for [plaintiff's] lawsuit is her claim that the release of carbon monoxide gas inside the rental house "poisoned her" . . . . Accordingly, . . . the plain language of the pollution exclusion clause excludes . . . coverage . . . .

667 S.E.2d at 92. The allegations in the Underlying Lawsuit allege oxygen-deprivation, not nitrogen "poisoning," and therefore, the less determinative facts here demand the Court evaluate ordinary definitions of "irritant" and "contaminant."

Additionally, Plaintiff argues that "poison" is not a requirement of "pollutant." (Pl.'s Reply to Def.'s Second Resp. to Mot. for Summ. J., Doc. 45, at 3-4.) The Court is not determining, nor is it tasked with determining, whether "poison" or "poisoning," or the absence thereof, places a substance within or outside the definition of "pollutant." <u>Reed</u> found that carbon monoxide, which poisoned the plaintiff in the underlying litigation, unambiguously qualified as an irritant or contaminant, and therefore, a pollutant. 667 S.E.2d at 92. The Court here must decide whether, based on the allegations in the Underlying Lawsuit that the accumulation of nitrogen created an oxygen-deprived environment, "irritant" or "contaminant" unambiguously incorporate nitrogen. Even if "poison" or "poisoning" is not required to classify a substance as an "irritant" or "contaminant," it does not necessarily follow that all non-poisons or non-poisonous substances meet the definition of "irritant" or "contaminant."

[11] Defendant Xytex provided several more restrictive definitions in support of its position as well. (Def.'s Resp. to Mot. for Summ. J., Doc. 32, at 15-16.) However, because the Court concludes that the broader definitions supplied by <u>Lake Hills</u> do not render the plain language unambiguous, the Court need not supply analysis on other definitions.

etc.'" Id. at 438, 1010; Lake Hills, at 5-6. These definitions do not demand the conclusion that nitrogen is an "irritant," and resultingly, a "pollutant." The Parties agree that nitrogen is present in large quantities in the ambient air. (St. of Mat. Facts, ¶ 13; Resp. to St. of Mat. Facts, ¶ 13.) On the one hand, if nitrogen is inhaled in large quantities, with no adverse effect, it cannot be said to annoy. On the other hand, if it can create an oxygen-deprived environment leading to asphyxiation, the Court understands how nitrogen could be considered something that annoys. Contaminant also yields multiple interpretations. If nitrogen was an unclean or bad substance, the human population would be unable to inhale the substance in such large quantities. Similarly, the air is not considered unclean or impure because it contains nitrogen. However, in an enclosed environment, it is possible to interpret that nitrogen makes the air unsuitable for breathing by forcing down the oxygen concentration. With multiple, plausible interpretations, "irritant" and "contaminant" do not decidedly encompass vaporized liquid nitrogen.[12]

---

[12] Plaintiff directs the Court to the history of pollution exclusions in general liability contracts. The Court recognizes that Georgia law does not limit "pollutant" to traditional industrial and environmental pollutants. Smith, 784 S.E.2d at 425. The Court further recognizes that the insurance industry's removal of "toxic" before "chemicals" in "absolute pollution exclusions," such as those present here, expanded the number of chemicals qualifying as pollutants. Id. The Court is not disregarding this history or Smith's interpretation of it. The Court is not concluding that because the vaporized liquid nitrogen was not an environmental pollutant it cannot be a "pollutant" as defined in the relevant exclusions. The Court is, however, determining that the nitrogen in this case is not unambiguously a "pollutant" according to the plain language of the exclusions.

If the plain language of the policy does not result in a finding that the terms are unambiguous, Georgia law requires the reviewing court to apply rules of contract construction. Geiger v. Ga. Farm Bureau Mut. Ins. Co., 699 S.E.2d 571, 573 (Ga. Ct. App. 2010). A hallmark of the rules of construction demands consideration of "the policy as a whole, to give effect to each provision, and to interpret each provision to harmonize with each other." ALEA London Ltd. v. Woodcock, 649 S.E.2d 740, 745 (Ga. Ct. App. 2007).

> [If contract provisions] are "susceptible to more than one meaning, even if each meaning is logical and reasonable[,]" . . . there are three [additional] well-known rules of contract construction that apply: (1) ambiguities are strictly construed against the insurer as the drafter; (2) exclusions from coverage the insurer seeks to invoke are strictly construed; and (3) the contract is to be read in accordance with the reasonable expectations of the insured when possible.

Auto-Owners Ins. Co. v. Neisler, 779 S.E.2d 55, 59 (Ga. Ct. App. 2015); accord Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 498 S.E.2d 492, 494 (Ga. 1998). Finally, O.C.G.A. § 13-2-2 offers additional rules of construction at the court's disposal upon arriving at ambiguity. See Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Ass'n, 654 S.E.2d 207, 209 (Ga. Ct. App. 2007).

The Pollution exclusion in the Primary Policy states: "This insurance does not apply to . . . 'Bodily injury' . . . which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration,

release or escape of 'pollutants' at any time."[13]  Although the Court discusses Defendant Xytex's "arising out of" argument below, the provision must be read in its entirety in an attempt to determine the meaning of "pollutant."  The language is clear that coverage is excluded when the release of "pollutants" causes bodily injury.

Defendant Xytex argues that because the Underlying Lawsuit fails to allege that inhalation of nitrogen caused the health issue, it is not a "pollutant."  Plaintiff, on the other hand, argues that a substance as "innocuous" as storm water run-off meets the pollutant exclusion.  (Br. Supp. Mot. for Summ. J., Doc. 25-1, at 12.)  Although true, when reading the provision in its entirety, the type of injury sustained is essential to analyzing the exclusion.  Where property damage is the injury, as was the case in Lake Hills, water run-off that has "significant detrimental effects on the quality of waters into which they flow" is unambiguously a "contaminant."  The same is true for carbon monoxide and lead poisoning caused bodily injury.  The adverse health affects of lead poisoning and carbon monoxide poisoning are well known.  See Smith, 784 S.E.2d at 426 n.1 ("[T]oxic effects of lead have been known for centuries.")  Therefore, when bodily

---

[13] The Court notes that the Excess Policy contains the words "[a]ny liability" in the place of "bodily injury."  However, because the "bodily injury" remains the injury allegedly triggering coverage, the Court analyzes the Pollution exclusions in the Primary and Excess Policies together.

injury results from the migration, release, or escape of lead-based paint or carbon monoxide, the substances unambiguously meet the definition for "pollutant." Id. at 425–26; Reed, 667 S.E.2d at 92. The same cannot be said for nitrogen. The facts of this case more closely resemble Barrett than Reed, Smith, or Lake Hills; Barrett remains good law.

When read as a whole, the provision is susceptible to multiple meanings. Plaintiff reasons that because nitrogen displaces oxygen in the air, it is an "irritant" to persons attempting to breathe the air and is a "contaminant" to the breathable air; the resulting bodily injury arose from that pollution. Defendant Xytex responds that the Underlying Lawsuit alleges that lack of oxygen caused the injury and there is no contamination or irritation of the body in the way carbon monoxide and lead contaminate and irritate the body or water run-off contaminates a lake.

Finally, the Court cannot ignore the mandate to construe ambiguities against the insurer and that insurance exclusions are to be strictly construed. There is evidence in the record that, considering Defendant Xytex is in the business of storing tissue at low temperatures using liquid nitrogen, Defendant Xytex reasonably expected that liability related to a nitrogen leak would be insured.[14] (Scholer Decl., ¶¶ 5-7.) After reviewing the plain

---

[14] Defendant Xytex argues that the Pollution exclusion violates Georgia public policy. (Def.'s Resp. to Mot. for Summ. J., at 19.) Relying on Barrett, Defendant Xytex claims that liquid nitrogen qualifies as a "main product" of

language of the insurance contract, analyzing the applicable law, and applying Georgia's rules of contract construction, ambiguity remains. There is an issue of fact as to whether the Parties intended for nitrogen to be considered an "irritant" or "contaminant," and the Court may not guess or speculate as to the Parties' intent. See RLI Ins. Co., 635 S.E.2d at 171-72.

2. Hazardous of Toxic Materials Exclusion

The Court finds Plaintiff's argument that the Hazardous or Toxic Materials exclusion unambiguously excludes coverage less convincing than its Pollution exclusion argument. Again, reviewing the plain language, "hazardous or toxic materials" is defined as "[a]sbestos, lead, silica dust, toxic dust, 'fungi', bacteria, organic pathogens, bio-organic growth or systemic chemical poison." Nitrogen is not enumerated. Instead, Plaintiff argues that nitrogen is undoubtedly a "systemic chemical poison." (Br. Supp. Mot. for Summ. J., at 14.) Because systemic chemical poison is not defined, Plaintiff combines definitions of "systemic" and "poison." The Parties appear to agree that "systemic" is intended to mean "affecting the body generally" or something similar. The issue, like under the Pollution exclusion,

---

its business and excluding coverage for the release of nitrogen gas defies Defendant Xytex's reasonably held expectations for coverage. (Id.) The Court finds there is insufficient evidence in the record to determine whether liquid nitrogen is one of Defendant Xytex's main products as a matter of law.

becomes whether the plain language of the exclusion is read to include nitrogen as a poison.

Here, nitrogen is not certainly a poison, and the Court is faced with equally plausible interpretations of poison. "Poison" carries either its broad meaning as a substance that inhibits the activity of another substance or the course of a chemical reaction or process, (id. at 14) or more narrow meaning as a substance that causes illness or death when absorbed. (Def.'s Resp. to Mot. for Summ. J., at 21.) The plain language of the Policies does not require a finding that Plaintiff's definition prevails.

Plaintiff further argues that based on the underlying allegations — namely, Defendant Xytex's failure to advise or warn of the presence and storage of hazardous gas in the warehouse (Underlying Lawsuit Compl., ¶ 10) — that nitrogen must be hazardous. (Br. Supp. Mot. for Summ. J., at 15.) However, as noted in footnote eight, supra, the Court may not substitute another definition for "hazardous or toxic materials." The term "hazardous or toxic materials" is plainly defined in the Primary Policy. Consequently, for the purposes of this exclusion, the meaning of "systemic chemical poison" is determinative, and the Court concludes "systemic chemical poison" carries plausible meanings that do not necessarily encompass liquid nitrogen.

Turning to the rules of contract construction, the ambiguity is not resolved. Extrinsic evidence on the issue is limited, and

the traditional rules of construction do not materially aid in resolving the ambiguity. For this and other reasons discussed in the contract construction analysis for the Pollution exclusion, a fact issue as to the intent of the Parties remains.

### 3. The Exclusions' Causation Requirements

Defendant Xytex further contests summary judgment because it contends a fact issue exists as to whether the nitrogen release caused the injuries complained of in the Underlying Lawsuit. According to the relevant exclusions, to succeed on summary judgment, Plaintiff is required to show the absence of a genuine issue of material fact that nitrogen is a "pollutant" or "hazardous or toxic material" and that the release of the "pollutant" or "hazardous or toxic material" caused Greg Meagher's death.

#### a. *Primary Policy*

In relevant part, the Primary Policy excludes coverage for "'bodily injury' . . . which would not have occurred in whole or part but for the . . . release . . . of 'pollutants' at any time." The plain language of the Policy, "would not have occurred in whole or part but for," is unambiguous. Barrett concluded that when an exclusion provision contains causation language such as "arising out of," courts apply a "but for" or "cause-in-fact" analysis.[15] 696 S.E.2d at 332. The Parties dispute whether the release of

---

[15] The Court finds no material difference between the language "arising out of" and "would not have occurred but for." For that reason, Georgia's application of the "but for" test for causation in insurance policy exclusions applies here.

nitrogen was, in part, a but for cause of the bodily injury. In light of *Barrett*, Plaintiff has failed to make a showing that the release of nitrogen was a partial but for cause as a matter of law.

The Court agrees with Plaintiff that, according to the plain language, Plaintiff is not required to show the release of nitrogen was the sole cause. The record demonstrates that whether the release of nitrogen was a partial but for cause of the injuries is in dispute because nitrogen is naturally harmless. Moreover, as *Barrett* instructs, an evaluation of the Underlying Lawsuit complaint reveals that several actions attributed to Defendant Xytex beyond the release of liquid nitrogen are alleged to have caused the injury. (Underlying Lawsuit Compl., ¶¶ 40-44.) These factual disputes make it improper for the Court to determine which, if any, of the alleged causes constitute a partial but for cause of the bodily injury as a matter of law.

Although the language differs slightly, the Court reaches the same conclusion for the Hazardous or Toxic Materials exclusion: "This insurance does not apply to: . . . '[b]odily injury . . . arising out of, caused or contributed to by 'hazardous or toxic materials' . . . ." Because the language of the provision includes the words "contributed to," Plaintiff is not required to show that the release of a "hazardous or toxic material" was the only cause. However, Plaintiff still must

38

satisfy the but for causation requirement. For the reasons set forth above, a jury must resolve the remaining fact issues.

        b. *Excess Policy*

The Pollution exclusion in the Excess Policy requires Plaintiff to make a greater showing than the Primary Policy: "This policy does not apply to: . . . [a]ny liability arising out of the . . . release of 'pollutants' at any time." The "arising out of" language is unambiguous and precisely tracts the language in Barrett. 696 S.E.2d at 332. Therefore, the language mandates a but for causation showing. Furthermore, the Excess Policy does not permit a showing that the release of the "pollutant" was a partial cause. Succeeding at the summary judgment stage on the causation requirement under the Excess Policy demands that the release of a "pollutant" was the single, undisputed cause-in-fact of the alleged injuries as a matter of law. Again, Plaintiff has not met that burden.

    4. <u>Punitive Damages Exclusions</u>

Defendant Xytex concedes that the Primary and Excess Policies exclude coverage for punitive damages in the Underlying Lawsuit. (Def.'s Resp. to Mot. for Summ. J., at 7 n.3.) Because Defendant Xytex does not oppose that the language excluding coverage for punitive damages is unambiguous, summary judgment is proper as to Plaintiff's claim that it has no duty to indemnify for punitive damages pursuant to the Policies.

## 5. Reimbursement of Defense Costs

Plaintiff's motion for summary judgment asks the Court to order the reimbursement of defense costs upon reaching the conclusion that it had no obligation to defend the Underlying Lawsuit. "Whether an insurer has a duty to defend depends on the language of the policy as compared with the allegations of the complaint." HDI-Gerling Am. Ins. Co. v. Morrison Homes, Inc., 701 F.3d 662, 666 (11th Cir. 2012) (quoting Hoover v. Maxum Indem. Co., 730 S.E.2d 413, 418 (Ga. 2012)). "For an insurer to be excused under Georgia law from its duty to defend an action against its insured, the allegations of the complaint must unambiguously exclude coverage under the policy." Id. (citing JNJ Found. Specialists, Inc. v. D.R. Horton, Inc., 717 S.E.2d 219, 223 (Ga. Ct. App. 2011)). The Court determined that the Policies' decisive terms are ambiguous. Because the Underlying Lawsuit complaint's allegations fail to unambiguously exclude coverage under the Policies, Plaintiff is obligated to defend the Underlying Lawsuit under Georgia law.[16]

### V. CONCLUSION

In sum, the following **IS HEREBY ORDERED**:

(1) The Parties' joint motion to add defendants (Doc. 48) is **GRANTED.** The Clerk is **DIRECTED** to **ADD** Lindsey Meagher, as Executor

---

[16] The conclusions herein render the reimbursement issue moot. Thus, the Court refrains from addressing whether Georgia recognizes the "right of reimbursement."

for the Estate of Greg Meagher; Xytex Cryo International, LTD.; and Xytex Properties LLC as defendants in this action. All submissions filed on behalf of Lindsey Meagher, individually; Mary Meagher; and Emma Meagher are treated as if they were filed on behalf of Lindsey Meagher, as Executor for the Estate of Greg Meagher. Additionally, all submissions filed on behalf of Xytex Tissue Services, LLC are treated as if they were filed on behalf of Xytex Cryo International, LTD. and Xytex Properties LLC. The defendants added pursuant to this Order are bound by all other rulings contained herein.

(2) Plaintiff's motion to exclude testimony (Doc. 24) is **GRANTED IN PART** and **DENIED IN PART**. To the extent Dr. Zuckerman offers opinions regarding Plaintiff's duties to defend and indemnify under the contract or general opinions regarding the provisions in the Primary and Excess Policies that constitute legal arguments, that testimony is excluded. Moreover, to the extent Dr. Zuckerman's testimony requires knowledge of the insurance industry, such testimony is also excluded. Dr. Zuckerman is permitted to testify regarding all other matters within his expertise, chemistry.

(3) Plaintiff's motion for summary judgment (Doc. 25) is **GRANTED IN PART** and **DENIED IN PART**. As a matter of law, Plaintiff has no duty to indemnify for punitive damages under the Policies. The remainder of Plaintiff's motion for summary judgment is denied.

**ORDER ENTERED** at Augusta, Georgia, this 27th day of March, 2019.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA